UNITED STATES of America ex rel. Ronald BURBANK, Petitioner,

v.

WARDEN, ILLINOIS STATE PENITENTIARY, Respondent.

No. 73 C 2527.

United States District Court, N. D. Illinois, E. D.

Oct. 23, 1975.

Kenneth N. Flaxman, John T. Moran, Chicago, Ill., for petitioner.

William J. Scott, Atty. Gen. of Ill., Steven Rosenberg and Michael J. Murphy, Asst. Attys. Gen., for respondent.

## MEMORANDUM OF DECISION

LYNCH, District Judge.

This cause of action was instituted by a petition for habeas corpus filed pursuant to 28 U.S.C. Section 2254. The cause was originally dismissed by an opinion of this Court on the basis of failure to exhaust state remedies and waiver of the issues presented by failure of the petitioner to raise those issues in the state courts. The dismissal of the petition was reversed by a decision of the Seventh Circuit Court of Appeals which, in essence, held that petitioner had exhausted all state remedies and that the record before the Court of Appeals failed to indicate that there was a reasonable basis for petitioner's trial counsel to fail to assert certain constitutional issues which petitioner raises in his petition. The Court of Appeals remanded the cause to this Court and directed it to hold a hearing, where appropriate, on the claims raised in the petition which were raised or could have been raised in the state courts.

Petitioner has been incarcerated in the Illinois State Penitentiary while serving a term of 100 to 150 years imposed by the Circuit Court of Cook County after a jury found him guilty. Petitioner originally advanced six claims in his habeas corpus petition in an attempt to overturn his state conviction. Following the remand to this Court from the Circuit Court of Appeals, petitioner specifically abandoned two of the six claims and withdrew them from this Court's consideration.

Three of the four remaining claims (use of a coerced confession, improper restriction of cross-examination, and deprivation of the right to counsel at a line-up) were decided adversely to petitioner after this Court reviewed the state court record and all the briefs on file in this cause. The one remaining claim related to whether certain evidence used against the petitioner at his trial was the tainted fruit of his unlawful arrest. This Court found that the state court record was not sufficiently complete so as to allow this Court to make a determination as to this claim since the state court did not deal with this issue. The Court then conducted an evidentiary hearing in order to determine the merits of the remaining claim. The Court will make an exposition of the facts relating to the pertinent claim before dealing directly with the merits of petitioner's argument. The following set of facts is culled from both the record of the state court proceedings and the evidentiary hearing held in this Court.

## I

A person by the name of Mihran Boghosian was killed during the course of an attempted armed robbery of a shoe store he operated on the south side of Chicago. A preliminary police report was prepared following interviews with several people who were in the vicinity of the shoe store at the time the incident took place. The incident took place on the night of July 30, 1968, and the report was prepared late that night. The report contained a general description of two men, sus-pected to be the offenders, who fled from the scene of the crime. Apparently little else was discovered by the police concerning the incident over the course of the remainder of the night and the early morning hours.

Chicago police officers Raymond Luth and Daniel Fitzgerald were assigned to Area 3 Homicide in the City of Chicago in July of 1968. When they reported for duty on the morning shift at 8:30 A.M. on July 31, 1968, they were assigned to investigate the homicide of Mihran Boghosian. These officers commenced their investigation by examining the report referred to above and speaking with the investigators who had prepared the report.

The description of one of the two offenders contained in the report indicated that the offender was a male negro, eighteen to twenty years of age, light skin, curly hair, between five feet six inches and five feet eight inches in height, wearing a yellow or gold shirt, black shoes, and carrying an automatic pistol. The report indicated that the offender had a neat appearance and was good looking. The report also indicated the offenders' path of flight. This information, contained in the report, represented the totality of facts passed on to Fitzgerald and Luth. Although the investigators had worked through the night, they had produced no further leads for investigation.

Officers Luth and Fitzgerald discussed the report after reading it. Officer Fitzgerald indicated that he knew the identity of one of the subjects due to the above referred to description contained in the report. He said that the suspect was the petitioner. Fitzgerald said that he had come in contact with petitioner before. He knew that petitioner lived in the general area of the incident and in the path of flight of the offenders. Fitzgerald matched the description in the report with petitioner because he knew petitioner to be a light-skinned, well dressed and attractive looking young man.

After the above description, Officer Fitzgerald and Officer Luth left Area 3 Homicide and proceeded to the vicinity of 7100 South Ashland Avenue in Chicago where Officer Fitzgerald believed that the petitioner lived. They arrived at their destination at 10:00 or 10:30 A.M. Petitioner's mother told the officers that petitioner was not present. However, the petitioner did arrive at that location approximately ten minutes after the police arrived.

When Officer Fitzgerald originally testified at a hearing on a motion to suppress prior to the petitioner's state court trial, he testified that he then told petitioner that "he was a suspect in a murder case," and that he then placed petitioner under arrest. It is undisputed that the officers were not armed with an arrest warrant at the time they took petitioner into custody. Officer Fitzgerald testified that at the time of his arrest, petitioner was wearing a white tee shirt, black pants, and sandals. As indicated above, the police report indicated that the offender was wearing a gold shirt and dark green pants.

Officer Fitzgerald took petitioner into custody in his mother's house and advised him of his *Miranda* rights. Petitioner then left the house with Officers Luth and Fitzgerald. Petitioner got into the officers' car. Petitioner was questioned about the subject homicide and disavowed any knowledge of it whatsoever. Subsequently, he admitted that he had been in the area of the incident at the time of the shooting and had seen two men flee from the area but he still asserted that he was in no way involved in the homicide.

A squadrol eventually came to pick the petitioner up and transport him to Area 3 Homicide located at 39th Street and California Avenue. Officers Fitzgerald and Luth did not accompany petitioner on his trip to the stationhouse. About 45 minutes after they put petitioner in the squadrol, Officers Fitzgerald and Luth met up with petitioner again at Area 3 Homicide. Petitioner, once

again, was advised of his constitutional rights and further interrogation took place. This interrogation eventually led to an oral admission by petitioner of his involvement in the attempted robbery although he stated that he was not the individual who shot the deceased.

A lineup was conducted at approximately 1:00 P.M. to 1:30 P.M. in the afternoon of July 31, 1968, shortly after the time when petitioner made the above admission. Three witnesses who had spoken to police investigators the night before were invited to the station to view the lineup that petitioner had been placed in. These witnesses picked out petitioner as one of the men seen fleeing from the scene of the crime the night before. Petitioner was then removed from Area 3 Homicide sometime around 2:00 P.M. to 3:00 P.M. on the afternoon of July 31, 1968. Evidence was received during the course of petitioner's trial as to the statements made by petitioner to Officer Fitzgerald and to the lineup identifications that are discussed above.

## II

## CONSCIOUS BY-PASS OF THE UNLAWFUL ARREST CLAIM

Respondent argues that petitioner's claim that his conviction rests upon evidence which was the tainted fruit of an unlawful arrest is not properly before this Court. In remanding this case, the Court of Appeals indicated that the instant issue is properly raised through federal habeas corpus in the absence of proof that a deliberate tactical decision was made to forego the claim. *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

■. Respondent points out that petitioner failed to assert the claim of unlawful arrest at any time that his case was pending in the state court system and that the first time petitioner raised this claim was in his federal habeas corpus petition. After making this observation, respondent summarily con-

cludes that petitioner consciously by-passed every opportunity to raise this claim. Respondent offers no other theory or proof as to how any by-pass of this claim was "conscious." This Court now has the entire record of proceedings at petitioner's prosecution. The Court has reviewed said record and has found nothing contained therein that would indicate that petitioner waived his unlawful arrest claim in an attempt to gain a strategic advantage or for any other reason. Consequently, the failure to demonstrate a reasonable basis for failing to raise this claim convinces this Court that it must consider the merits of the unlawful arrest claim.

## III

### PROBABLE CAUSE TO ARREST

The factors involved in determining whether the police had probable cause to arrest petitioner are relatively simple. Officer Fitzgerald indicated that when he was assigned to the Boghosian case all he had to work with was a report prepared by investigators who had worked on the case the night before. Those investigators had indicated to him that they had come up with no leads or information other than the information contained in that report. The report contained descriptions of two suspects one of which was described as a male negro, eighteen to twenty years of age, light skin, curly hair, between five feet six inches and five feet eight inches in height, wearing a yellow or gold shirt, black shoes, and carrying an automatic pistol. The report also contained information as to the offenders' path of flight. Officers Fitzgerald and Luth had received no other leads as to the identity of the offenders when they set out to find the petitioner in order to arrest him. As Officer Fitzgerald put it, he knew that petitioner lived in the area where the incident took place and that he lived close to the path of flight of the offenders. He also knew the petitioner to be light skinned, well-dressed and attractive in appearance. It is

the composite of this evidence upon which this Court must decide whether the police had reasonable grounds to believe that petitioner had committed the offense in question. It is the opinion of this Court that the above information does not rise to the level of probable cause to arrest.

It must be noted that there is little about the description that amounts to a distinguishing characteristic. The information portrays an average sized young black person who was considered to be attractive in appearance. No distinguishing characteristics such as scars, facial hair or any other physical peculiarities are offered. Although the description of a person as well-dressed or attractive in appearance may offer some basis of distinction, such descriptions must be considered subjective in nature and of little weight in pinpointing a person's identity.

Furthermore, the location of petitioner's home in relation to the scene of the incident does little more to convince this Court that the police had probable cause. This is an accidental factor that shed little light on the situation, especially considering the general population density in the inner-city of Chicago.

Respondent emphasizes that Officer Fitzgerald had seen petitioner many times before. This would be a truly salient consideration if this Court were determining the reliability of eyewitness identification of an offender. However, that is not the issue now before this Court. The question is whether the description contained in the report was sufficient to link petitioner to the commission of this offense in such a way that the police could reasonably believe that petitioner committed it.

This Court has failed to uncover a decision in any case in which a finding of probable cause was found under circumstances similar to those in the case at bar. The Court has considered the major cases relating to probable cause to arrest such as *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134

(1959) and *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). The facts of the case at bar reveal even fewer grounds for believing petitioner committed the subject crime than law enforcement agents had in the former cases where arrests were held to be unlawful. Of course, this Court cannot hope to find an identical situation upon which to rely. All cases are unique in some manner or form and each case must be scrutinized in terms of its own peculiar set of facts.

■■ The fact remains that petitioner could have been considered nothing more than a suspect until the police had discovered some other evidence which would have led to probable cause to arrest. It is not the function of this Court to speculate as to what steps the police may have taken to gain a more solid case than they had when armed solely with the vague and general description that was at their disposal. The Court feels that the very words uttered by Officer Fitzgerald upon first confronting the petitioner, i. e. that petitioner was a *suspect* in a murder case, accurately describes the situation as it existed at the time of petitioner's arrest. However, even a "strong reason to suspect" does not amount to probable cause to arrest. *Henry v. United States*, 361 U.S. at 101, 80 S.Ct. 168. The Court finds that the facts of this case did not lead the arresting officer to anything more substantial than a strong reason to suspect at the time the arrest was made and the Court, consequently, finds the arrest of the petitioner to be unlawful.

## IV

### THE FRUITS OF THE ARREST

Certain statements were elicited from petitioner following his arrest. The first of these statements was taken almost immediately after he had been taken into custody and removed from his mother's house. Further interrogation by the police at that time caused petitioner to alter his story somewhat although the statement was still exculpatory in nature.

Petitioner was removed to Area 3 Homicide where he was interrogated further. Another statement was taken from petitioner at the stationhouse in which he fully admitted to participation in the crime charged. The record indicates that this statement was taken some two to three hours following his first contact with the police and his arrest. Very shortly after the giving of this statement, petitioner was placed in a line-up and was identified at that line-up by several witnesses who were near the scene of the crime at the time it occurred. Testimony regarding these line-up identifications was received at petitioner's trial. Petitioner contends that the admission into evidence at his trial of testimony regarding these statements and line-up identifications was improper as this evidence must be considered fruit of his unlawful arrest. He argues that the evidence should be held to be inadmissible under the decision in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ Respondent argues that even if we are to assume that the arrest was unlawful, the petitioner's statements were not tainted by the arrest and were properly admitted into evidence. The respondent makes this argument based on the principle that not all evidence is "fruit of the poisonous tree" simply because it would not have been discovered but for the alleged actions of the police. *Wong Sun, supra*, at 371 U.S. 487, 83 S.Ct. 407. Respondent argues, and properly so, that the test to be applied in such situations is whether under the totality of circumstances the statement following the illegal arrest was voluntary.

It is argued that because petitioner made his statements only after receiving the warnings required by the decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), any taint of the illegal arrest was removed and evidence of the statements was admissible. Respondent points out that several jurisdictions have held that *Miranda* warnings alone are sufficient to remove the taint of the illegal arrest

citing, among other cases, the Illinois Supreme Court decision in *People v. Brown*, 56 Ill.2d 312, 307 N.E.2d 356 (1974). The conclusion reached by respondent is that the giving of *Miranda* warnings to petitioner sufficiently attenuated the statement from the illegal arrest so·as to dissipate any taint.

A petition for certiorari was granted by the United States Supreme Court in the *Brown* case, *supra*, during the pendency of this action. The High Court returned an opinion in that case on June 26, 1975. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416. The Supreme Court overruled the Illinois Supreme Court's holding and rejected the latter court's *per se* rule that *Miranda* warnings *alone* always make the giving of a statement sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegal arrest and the confession. In so holding, the Court indicated that it is necessary to distinguish between Fourth and Fifth Amendment issues when dealing with the exclusionary rule. Thus, the Court stated:

> Thus, even if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, Wong Sun requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be "sufficiently an act of free will to purge the primary taint." At 601, 95 S.Ct. at 2261.

The holding of the United States Supreme Court in *Brown* forcefully indicates that the giving of *Miranda* warnings to petitioner did not, in and of itself, attenuate petitioner's statements from his illegal arrest. Consequently, this Court is compelled to examine the totality of circumstances in this case, pertinent to this issue, in order to determine whether the subject evidence was admissible or not.

It is true that *Miranda* warnings are a significant factor in determining whether a confession is obtained by exploitation of an illegal arrest. However, other factors include the temporal proximity of the arrest and the confession, the presence of intervening circumstances such as consultation with counsel, the accused's presentation before a magistrate for a determination of probable cause, or release on bond, see *Johnson v. Louisiana*, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), and, finally, the purpose and flagrancy of the official misconduct.

The Court notes initially that the series of events including petitioner's arrest, his giving of statements, and the line-up in which he was placed covered a period of little more than three hours. The first statements taken from him were taken almost immediately after his arrest. This rapid succession of events indicates that there was a rather close temporal proximity between the illegal arrest and the gathering of the objected to evidence.

There were no intervening circumstances of any great significance in the case at bar that would indicate a break in the causal connection between the arrest and the statements and line-up. The petitioner had not consulted with counsel. The police had not taken petitioner before a magistrate for a determination of probable cause. No other steps had been taken to institute formal proceedings against petitioner. Petitioner had not been released on bond. In fact, the same policemen, Officers Fitzgerald and Luth, played significant roles in each part of this series of events. This fact suggests an element of cohesiveness to the events rather than a significant break.

In *Wong Sun, supra*, evidence of an inculpatory statement made by one of the defendants in that case was held to be admissible notwithstanding that defendant's illegal arrest. In the instance of that defendant, in the intervening period between his arrest and his confession de-

fendant had been arraigned, released on his own recognizance, and had returned voluntarily several days later to make the statement. Under those circumstances, the Court held that the connection between defendant's unlawful arrest and his statement had become so attenuated as to dissipate the taint. None of the factors present in the case of *Wong Sun*, or anything remotely resembling them, exists in the case sub judice.

Finally, the statements made by Officer Fitzgerald during both petitioner's trial and the evidentiary hearing held in this Court indicate that at the time of petitioner's arrest, Officer Fitzgerald simply told petitioner that he was a *suspect* in a murder investigation. This statement evinces at least a negligent attitude on the part of the police in that they acknowledged that petitioner was merely a suspect. Investigative arrests have been specifically condemned and yet the statements made by the police indicate that this arrest appeared to be no more than an "investigative arrest." See *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) and *Brown, supra,* at 422 U.S. 590, 95 S. Ct. 2254, 45 L.Ed.2d 416.

Based upon the above analysis, it is the opinion of this Court that the connection between petitioner's arrest and the giving of his statements and the lineup he participated in had not become so attenuated as to dissipate the taint of the illegal arrest. It is the opinion of this Court that the evidence in question was gained by exploitation of the illegal arrest. Therefore, the evidence relating to the statements made by defendant and the line-up identifications was inadmissible and should not have been introduced at petitioner's trial.

According to the above analysis, petitioner's constitutional rights were violated during the course of his prosecution and the conviction based on the tainted evidence cannot stand. Consequently, it is the order of this Court that the petition for a writ of habeas corpus

is granted and the Court orders respondent to enlarge petitioner from state custody if he is not afforded a new trial within 120 days.